UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CATHLEEN B.,[1]

                        Plaintiff

-vs-

COMMISSIONER OF SOCIAL
SECURITY,

                        Defendant.

_____

DECISION AND ORDER

1:20-CV-0939 CJS

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the application of Plaintiff for Social Security Disability Insurance ("SSDI") benefits and Supplemental Security Income ("SSI") benefits.   Now before the Court is Plaintiff's motion (ECF No.17) for judgment on the pleadings and Defendant's cross-motion (ECF No. 18) for the same relief.   For the reasons discussed below, Plaintiff's application is granted and Defendant's application is denied.

## STANDARDS OF LAW

The Commissioner decides SSDI and SSI applications for disability benefits using a five-step sequential evaluation process:

---

[1]  The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[2] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform. The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

---

[2] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ[)"]. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action. The Court will refer to the record only as necessary to rule on the alleged errors identified by Plaintiff.

In the administrative proceedings before the Commissioner, Plaintiff claimed to have become disabled in October 2016 due to a variety of ailments including chronic cough, chronic fatigue, fibromyalgia, eating disorder,[3] essential tremor, hearing loss, somatoform disorder[4] and depression with suicidal ideation. Tr. 20-22.

---

[3] Numerous treatment providers have indicated that Plaintiff is preoccupied with her diet, and that she allows herself to eat only a few specific foods, believing that other foods cause her to become ill. *See*, Tr. 25 ("[S]he was restricting herself to only nine food items every day[.]").   Plaintiff has also expressed the belief that she is infected with parasites.   In regard to these types of thoughts, treatment providers have noted that Plaintiff displays "perseverative thinking."

[4] "Somatic symptom disorder (SSD formerly known as 'somatization disorder' or 'somatoform disorder') is a form of mental illness that causes one or more bodily symptoms, including pain. The symptoms may or may not be traceable to a physical cause including general medical conditions, other mental illnesses, or substance abuse." https://www.webmd.com/mental-health/somatoform-disorders-symptoms-types-treatment.

Plaintiff underwent extensive diagnostic procedures, but such testing almost invariably failed to identify any physical cause for her complaints, leading doctors to attribute many of her symptoms to depression and/or somatic symptom disorder. Regarding somatization disorder or somatic symptom disorder, another Judge of this Court recently quoted the Mayo Clinic's website[5] as stating:

> "Somatic symptom disorder is characterized by an extreme focus on physical symptoms — such as pain or fatigue — that causes major emotional distress and problems functioning. You may or may not have another diagnosed medical condition associated with these symptoms, but your reaction to the symptoms is not normal. You often think the worst about your symptoms and frequently seek medical care, continuing to search for an explanation even when other serious conditions have been excluded. Health concerns may become such a central focus of your life that it's hard to function, sometimes leading to disability."

*Ian S. v. Comm'r of Soc. Sec.*, No. 20-CV-6022-A, 2021 WL 3292203, at *2 (W.D.N.Y. Aug. 2, 2021).

Plaintiff, who had a high-school education and was 52 years of age at the time of the administrative hearing, previously worked as a certified nursing assistant, machine operator, warehouse worker and school bus driver. Tr. 68.

Despite claiming to be unable to work on a full-time basis, Plaintiff was able to engage in some part-time activities, such as babysitting her grandchildren and volunteering at a hospital. Tr. 25 ("[S]he currently babysits her two grandchildren one day per week for five hours.   She also volunteers as an escort at the hospital . . . two days per week for three hours each day[.]"). Plaintiff was also able to drive a car, care for herself and perform a wide range of activities of

---

[5] Somatic symptom disorder: Symptoms & causes, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/somatic-symptom-disorder/symptoms-causes/syc-20377776 (last visited Aug. 2, 2021).

daily living. Tr. 22, 25.   Plaintiff, though, claimed that she became excessively fatigued after doing such activities, and needed to nap in the middle of each day. Tr. 25 ("She does nap/lie down every day.").

On January 19, 2016, nine months before the alleged disability onset date, Plaintiff's long-time treating physician's assistant Timothy Clark, P.A. ("Clark"), of the Churchville-Chili Family Medicine practice, stated in an office note that Plaintiff had indicated she was interested in working "for no more than 20 hours per week," since she felt she was "physically not able to do more." Tr. 597.   Clark wrote Plaintiff a note indicating that she could work up to 20 hours per week. Tr. 598 ("note written in pt. presence recommending return to work and requesting the afternoon bus run for no more than 20 hours per week.").

On October 19, 2016, Plaintiff sought mental health treatment from Genesee County Mental Health ("Genesee County"). Tr. 25, 695.   Plaintiff had been working part-time as a school bus driver, but had taken a leave from work due to depression and suicidal ideation.   Plaintiff reported having chronic health issues including "chronic fatigue syndrome." Tr. 695.   The evaluator, Amy Normann, M.S.W. ("Normann") reported that Plaintiff complained of *inter alia* "severe" chronic fatigue. Tr. 696.   Normann observed that Plaintiff displayed a flat affect, depressed mood and perseverative thought process. Tr. 697.

On November 9, 2016, psychiatrist Anthony Racaniello, M.D. ("Racaniello") performed a psychiatric evaluation in connection with Plaintiff's treatment at Genesee County. Tr. 702. Plaintiff told Racaniello, "I have no energy[.]" Tr 702.   Indeed, Plaintiff told Racaniello that she intended to go home and take a nap after the appointment. Tr. 703.   Racaniello noted, though, that Plaintiff did not display "lethargy" at that time. Tr. 703.   Racaniello stated that he was not

6

sure whether Plaintiff had a somatic symptom disorder, or whether she simply did not want to work. Tr. 706) ("The patient may have a somatic symptom disorder.   Differential here is that someone simply doesn't want to work.  .  .  .   There is a wide differential here, including Depressive Disorder NOS, Illness Anxiety Disorder, Somatic Symptom Disorder, Factitious Disorder, and Malingering.").   Racaniello stated that Plaintiff was a candidate for psychological testing. Tr. 706.

On January 6, 2017, Clark completed a "Medical Qualification/Work Status Report" concerning Plaintiff for the Genesee County Department of Social Services. Tr. 686-688.   Clark stated that Plaintiff was unable to work due to "fibromyalgia [and] chronic fatigue syndrome," until May 1, 2017. Tr. 686. Clark stated that Plaintiff was not limited with regard to walking, seeing, hearing, speaking, interacting with others and maintaining grooming; that she was moderately limited in sitting, standing, using hands, understanding and remembering instructions, carrying out instructions, maintaining attention and concentration, making simple decisions, and maintaining appropriate behavior; and that she was very limited in lifting, carrying, pushing, pulling, climbing and functioning in a work setting at a consistent pace. Tr. 688.

On January 6, 2017, Yu-Ying Lin, Ph.D. ("Lin") conducted a one-time consultative psychiatric evaluation of Plaintiff at the Commissioner's request. Tr. 675-679.   Lin reported that Plaintiff's "manner of relating" and "receptive language" were "poor," her mood was "dysthymic," her attention, concentration and memory seemed "moderately impaired," her cognitive functioning was average and her insight and judgment were "poor." Tr. 677.   Plaintiff reported doing normal activities of daily living, but with difficulty. Tr. 677.   Lin's medical source statement was as follows:

The claimant can follow and understand simple directions and instructions without limitation.   She can perform simple tasks independently without limitation.   She is moderately to markedly limited maintaining attention and concentration. She is mildly limited in maintaining a regular schedule.   She is mildly to moderately limited learning new tasks.   She is mildly to moderately limited performing complex tasks independently.   She is moderately to markedly limited in making appropriate decisions.   She is mildly limited in relating adequately with others. She is moderately to markedly limited appropriately dealing with stress. Difficulties are caused by cognitive deficits and stress-related problems.

Tr. 678.

On January 6, 2017, Rita Figueroa, M.D. ("Figueroa") conducted a one-time consultative internal medicine examination of Plaintiff at the Commissioner's request. Tr. 680-684.   Plaintiff told Figueroa, *inter alia*, that she had been diagnosed with fibromyalgia and that she lacked strength and stamina. Tr. 681.   Figueroa reported that Plaintiff appeared to be in no acute distress, but moved with a slow gait and seemed to have difficulty with her memory. Tr. 682. The results of Figueroa's physical examination were completely normal, with full range of movement, full strength in all extremities, normal neurologic findings and zero evidence of fibromyalgia. Tr. 683.   Figueroa's one-line medical source statement was as follows: "The claimant may have difficulty with activities requiring moderate exertion." Tr. 684.

On January 12, 2017, apparently at the recommendation of Dr. Racaniello, psychiatrist Virginia Wohltmann, M.D. ("Wohltmann") performed a psychiatric evaluation in connection with Plaintiff's treatment at Genesee County. Tr. 762-765.   Wohltmann noted that Plaintiff seemed depressed, and also "close to delusional" when discussing her belief that certain foods made her ill. Tr. 764.   Plaintiff indicated that she had fibromyalgia, though Wohltmann observed that, "She has . . . consulted multiple providers believing that there are physical causes for her

symptoms[, but most of the test results have been normal.]" Tr. 763.   Wohltmann's diagnostic impression was depressive disorder (not otherwise specified), eating disorder unspecified, undifferentiated somatoform disorder, persistent, and delusional disorder, somatic type. Tr. 765. Wohltmann recommended that Plaintiff continue outpatient care through Genesee County, which Wohltmann would monitor. Tr. 764.   Plaintiff continued to obtain treatment through Genesee County, overseen by Wohltmann and Racaniello, for the next two years. Tr. 25, 1221.

On March 8, 2017, Plaintiff told her Genesee County therapist that she had taken an enjoyable vacation in Florida, and that she still felt her diet was negatively affecting her moods. Tr. 1171–1173.

On July 5, 2017, Plaintiff told Wohltmann that she believed dietary issues were causing her fatigue and dysphoria. Tr. 1056.   On August 2, 2017, Wohltmann noted that Plaintiff did not appear to be depressed, though she "continue[d] to have multiple somatic issues." Tr. 1055, 1176.

On April 4, 2018, Wohltmann reported that Plaintiff was "fairly stable." Tr. 1048.

On April 9, 2018, Harbinder Toor, M.D. ("Toor") conducted a one-time consultative examination of Plaintiff at the request of the Genesee County Department of Social Services. Tr. 1077–1082.   Overall, Toor concluded that Plaintiff could work "up to 20 hrs. per week," that she was "[m]oderately limited" in carrying out instructions and maintaining socially appropriate behavior without exhibiting behavior extremes, and that she was able to "function in a work setting at a consistent pace." Tr. 1077.   Toor's physical examination findings were generally normal, except that Plaintiff was not able to squat fully, she needed hearing aids, and she had reduced range of motion in her lumbar spine. Tr. 1079.   In a section of the form report

9

concerning "estimated functional limitations," Toor was asked to rate Plaintiff's abilities by checking boxes for either "1-2 hours," "2–4 hours" or "more than 4 hrs." Tr. 1080.   With regard to walking, standing, sitting, seeing, hearing, speaking, using hands and using public transportation, Toor checked boxes indicating "more than 4 hrs." Tr. 1080.   With regard to pushing, pulling, bending, lifting, carrying, and using stairs, Toor checked the box for "1–2 hours." Tr. 1080.   Additionally, Toor indicated that Plaintiff could lift 10 pounds occasionally. Tr. 1080.

On June 27, 2018, Wohltmann completed a progress note, observing that Plaintiff was "about the same." Tr. 1132.   Wohltmann reiterated that Plaintiff had had "multiple medical work-ups that fail[ed] to reveal organic pathology." Tr. 1132.

On March 15, 2018, Plaintiff told her Genesee County therapist that she was continuing to have chronic fatigue, which she again attributed to her diet. Tr. 1061-1062.   Plaintiff indicated, though, that she was going to "be traveling a lot for the next few weeks" to "Florida, Kentucky and Albany" with her church. Tr. 1062.

On November 13, 2018, Plaintiff's Genesee County therapist noted that Plaintiff's mental status was largely normal, except for flat affect, a "negligible degree of conceptual disorganization" and perseverative thought process. Tr. 1154.   Plaintiff still reported a moderate degree of fatigue, though she noted that she and her boyfriend had been "been going to fairs around the area" and "having a good time," and that she was still babysitting and volunteering part-time. Tr. 1154.

On November 28, 2018, Plaintiff's Genesee County therapist reported that Plaintiff had stopped seeing Wohltmann for medication management since her "mood ha[d] improved significantly." Tr. 1150.   Plaintiff, though, still reported experiencing moderate chronic fatigue. Tr. 1150.

After Plaintiffs claim was denied initially, on December 7, 2018, an administrative hearing was held before an ALJ, at which Plaintiff, who was represented by an attorney, and a vocational expert ("VE") both testified.

During the hearing, the ALJ indicated, on his own initiative, that he would seek additional medical opinions from Dr. Paszko, Plaintiff's primary care doctor (with whom PA Clark worked) and Dr. Wohltmann. Tr. 86–87, 93–94.   The ALJ sent RFC questionnaires to both doctors. Paszko's office, however, responded with note stating, "We do not determine disability and therefore cannot complete this form." Tr. 1234.   As for the request sent to Wohltmann, Genesee County Mental Health responded with a note, not from Wohltmann but from Plaintiff's therapist, dated March 7, 2019, stating that Plaintiff had been discharged from treatment one day earlier: "Please be advised that Cathleen was discharged on March 6, 2019 from Genesee County Mental Health Clinic." Tr. 1246.   Consequently, the ALJ did not receive a substantive response from either Paszko or Wohltmann concerning Plaintiff's functional capacity.   Owing to this lack of a response, the ALJ deemed the record closed. Tr. 18 ("Accordingly, the record is closed[.]").

On April 8, 2019, the ALJ issued a decision finding that Plaintiff was not disabled at any relevant time.   Applying the five-step sequential evaluation process, the ALJ found, in pertinent part, that Plaintiff had two severe impairments (somatoform disorder and depression) and several non-severe impairments (chronic fatigue, fibromyalgia, neurogenic cough, laryngeal

neuropathy, gastro-esophageal reflux disorder, essential tremor, hearing loss, obesity and unspecified eating disorder), that either singly or in combination did not meet or medically equal a listed impairment.   The ALJ further found that Plaintiff had the RFC to perform less than a full range of light work. Tr. 24.   The ALJ found that with this RFC, Plaintiff could not perform her past work, but she could perform other jobs that were identified by the VE, and was therefore not disabled.

With regard to this RFC finding, the ALJ reviewed the evidence and indicated that Plaintiff's mental health condition had improved significantly, and that even prior to such improvement, Plaintiff's mental status examinations had almost always been normal. Tr. 25-26. The ALJ noted, for example, that Plaintiff had indicated to treatment providers that her mood had improved greatly with medication and therapy, and that she had eventually weaned herself off her depression medications, will no ill effects. Tr. 26.

The ALJ further indicated that Plaintiff's activities of daily living were not consistent with her allegations of disability.   The ALJ stated, for example, that Plaintiff was able to perform self-care and household chores, go on vacation, attend church and bible study, exercise, babysit her grandchildren, volunteer at a hospital and attend fairs with her boyfriend. Tr. 26.

The ALJ indicated, with regard to the medical opinion evidence, that he gave "partial weight" to the opinion of PA Clark, since some of Clark's findings were consistent with the evidence, while other findings, involving lifting, carrying, pushing, pulling, bending, and functioning in a work setting at a consistent pace, were not consistent with Clark's own examination findings. Tr. 27.   More specifically on this point, the ALJ stated:

> I give this opinion partial weight because, while some of Mr. Clark's findings are consistent with the evidence, his findings that the claimant is very limited with lifting, carrying, pushing, pulling, bending, and functioning in a work setting at a consistent pace [are] inconsistent with his own normal examination findings, as discussed in detail above.

Tr. 27.[6]

The ALJ indicated that he gave "significant weight" to the opinion of Dr. Lin, and did not mention any aspect of that opinion with which he disagreed. Tr. 27.[7]   Similarly, the ALJ assigned "great weight" to the opinion of Dr. Figueroa, without limitation, remarking that her findings were "consistent with her own examination of the claimant as well as the other largely normal examination findings[.]" Tr. 27.   Finally, the ALJ purported to give "significant weight" to the opinion of Dr. Toor, stating:

> Harbinder Toor, M.D., opined that the claimant could walk, stand, sit, see, hear, speak, use her hands, and use public transportation more than four hours per day. He opined that she could push, pull, bend, and climb stairs one to two hours per day.   He opined that she could lift ten pounds occasionally.   He also indicated that the claimant could work 20 hours per week with those restrictions.   I give this opinion significant weight, *although there is no indication that the claimant is limited to lifting ten pounds, given her babysitting activities, or that she is limited to no more than 20 hours per week, given the many normal examination findings discussed above*.

Tr. 28 (emphasis added).

---

[6] The ALJ was evidently referring to findings referenced only by exhibit number on page 21 of his decision (as part of his discussion at step two of the five-step sequential evaluation). Tr. 21 ("physical examination findings have been normal." (citing to Exhibit 6F, page 180, Exhibit 21F, page 3, and Exhibit 40F, pages 3, 4.").   The only exhibits pertaining to PA Clark and Dr. Paszko of Churchville-Chili Family Medicine are Exhibits 6F, 21F, 22F, 37F, 40F and 44F.   Of these, Exhibit 6F at p. 180, Exhibit 21F at p. 3, and Exhibit 40F at pp. 3 & 4 are the only instances of involving "physical examination findings" "discussed in detail above" by Clark to which the ALJ could have been referring. Tr. 21, 27.

[7] The Court observes that Dr. Lin's opinion was rendered prior to Dr. Wohltmann's diagnosis of somatoform disorder.

13

Regarding the ALJ's attempt, mentioned earlier, to obtain functional assessments from Paszko and Wohltmann, the ALJ noted that he had sent the requests but had not received back a completed RFC evaluation, though Genesee County had sent some additional office notes. Tr. 18, 28.

Plaintiff, represented by a new attorney, appealed the ALJ's decision.   However, the Appeals Council declined to review the ALJ's ruling.   Plaintiff then commenced this action.

In this action, Plaintiff contends that the Commissioner's decision denying benefits must be reversed for the following reasons: 1) the ALJ failed to properly evaluate and/or weigh the medical opinions as required by 20 C.F.R. § § 404.1257 7 416.927, for reasons discussed further below, including that the ALJ purported to give "significant weight" to several opinions but then failed to explain why he did not adopt aspects of those opinions that were favorable to Plaintiff; and 2) the ALJ failed to consider the effects of Plaintiff's somatoform disorder when evaluating her credibility and when weighing the medical opinion evidence.

Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence.

The Court has carefully reviewed and considered the parties' submissions.

## DISCUSSION

The ALJ's Alleged Failure to Properly Evaluate Plaintiff's
Somatoform Disorder

Plaintiff contends that the ALJ failed to properly consider the effects of her somatoform disorder when evaluating her credibility.   Plaintiff also contends that the ALJ erred in rejecting certain medical opinions due to the lack of positive test findings, since "by nature a somatoform

14

disorder does not produce objective clinical findings or test results."[8]   The Court agrees that the ALJ erred in several respects with regard to Plaintiff's somatoform disorder.

The Commissioner's regulations describe somatic-symptom-type disorders as follows:

**Somatic symptom and related disorders** (12.07).

*These disorders are characterized by physical symptoms or deficits that are not intentionally produced or feigned, and that, following clinical investigation, cannot be fully explained by a general medical condition, another mental disorder, the direct effects of a substance, or a culturally sanctioned behavior or experience*. These disorders may also be characterized by a preoccupation with having or acquiring a serious medical condition that has not been identified or diagnosed. *Symptoms and signs may include, but are not limited to*, pain and other abnormalities of sensation, gastrointestinal symptoms, *fatigue*, a high level of anxiety about personal health status, abnormal motor movement, pseudoseizures, and pseudoneurological symptoms, such as blindness or deafness.

Examples of disorders that we evaluate in this category include somatic symptom disorder, illness anxiety disorder, and conversion disorder.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(B)(6) (emphasis added).   It is not appropriate for an ALJ to dismiss the alleged symptoms of a somatic symptom disorder based on a lack of objective findings (*i.e.*, normal test results). *See, Lori H. v. Berryhill*, No. 3:18-CV-0472 (DEP), 2019 WL 1578195, at *4 (N.D.N.Y. Apr. 12, 2019) ("[I]t is inappropriate to reject the existence of somatoform disorder *and its disabling effects* based upon the lack of objective evidence alone.") (emphasis added).

---

[8]  Pl. Mem. of Law, ECF No. 17-1 at p. 36.

In the instant case, Plaintiff claimed to be unable to work primarily due to fatigue and depression.[9]   Plaintiff did not allege that she was completely unable to perform normal activities, but, rather, she alleged that she was extremely limited as to how long she could perform such activities before becoming fatigued.   For example, prior to the alleged disability onset date, Plaintiff had asked for a part-time schedule as a school bus driver, to accommodate her fatigue. After the alleged disability onset date, Plaintiff continued to engage in a wide variety of activities including shopping, driving, household chores, traveling, attending church, babysitting her grandchildren a few hours per week and volunteering at a hospital part-time.   However, Plaintiff indicated that she could only perform these activities for a few hours at a time before needing a nap.   Indeed, the ALJ noted that Plaintiff "consistently reported" "severe fatigue." Tr. 21. Accordingly, the issue in this case is not so much whether Plaintiff could perform the activities required of certain jobs, but whether she could perform them on a sustained basis, eight hours per day, five days per week. *See*, SSR-96-8P, 1996 WL 374184 at *7 (RFC finding pertains to claimant's ability "to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule[.]").

Plaintiff insisted that her fatigue was caused by either chronic fatigue syndrome or fibromyalgia, even though extensive diagnostic testing found no evidence to support those conclusions.   Nevertheless, as the ALJ observed, medical treatment providers such as PA Clark referred to Plaintiff as having those conditions by default, since Plaintiff continued to complain of the symptoms. Tr. 21. For example, when Clark completed an RFC evaluation for Plaintiff, he

---

[9]  *See*, ALJ Decision, Tr. 25 ("She stopped work in October 2016 due to chronic fatigue, severe depression, suicidal thoughts, near hearing voices, and being unable to work.").

indicated that in his opinion Plaintiff was unable to work due to "fibromyalgia [and] chronic fatigue syndrome." Tr. 686.   Similarly, Dr. Toor observed that Plaintiff's "chief complaints" were "chronic fatigue syndrome" and "fibromyalgia," despite the absence of "any trigger points." Tr. 1078. Toor's own examination findings were almost completely normal. Tr. 1079.   Nevertheless, Toor indicated that Plaintiff was limited to working no more than 20 hours per week, evidently because of fatigue. Tr. 1077.   Additionally, Dr. Figueroa opined that Plaintiff might have "difficulty with activities requiring moderate exertion," apparently due to fatigue, even though Figueroa's own physical examination of Plaintiff was essentially normal, including zero evidence of fibromyalgia. Tr. 684.   In that regard, Figueroa reported that, "The claimant reports muscle weakness.   She cannot sit or stand for prolonged periods of time.   She takes, everyday, a nap at 2 p.m.   She lacks stamina beyond 30 minutes." Tr. 681.   Further, Dr. Lin reported that Plaintiff claimed that she could "drive only short distances because of weakness, feeling fatigue, and difficulty focusing," and that she needed to "take[ ] naps." Tr. 678.   Notably, in each instance the evaluating doctor opined that Plaintiff was limited to some extent by her fatigue, even where the findings necessary to make a diagnosis of chronic fatigue syndrome or fibromyalgia were lacking.

Plaintiff's persistent belief that she had chronic fatigue syndrome and fibromyalgia, as well as other conditions, such as an inability to eat certain foods and a parasitic infection in her digestive track, despite the absence of supporting evidence, eventually led Wohltmann to diagnose her with somatoform disorder. *See, e.g.*, 1072 ("Although Client is beginning to consider that she may be experiencing delusions, she continues to seek medical causes for

depression and physical ailments.").[10]   Wohltmann made that diagnosis on the basis of certain delusional-type beliefs held by Plaintiff, even though Plaintiff's mental status examinations were otherwise generally normal.   Mental health treatment notes indicate, though, that Plaintiff consistently complained of fatigue, which, again, she attributed to chronic fatigue syndrome and/or fibromyalgia. *See, e.g.*, Tr. 1073 ("The client's symptoms include . . . chronic fatigue (4-severe)").   Indeed, Plaintiff evidently continued to complain of fatigue to her mental health treatment providers even after her depression symptoms improved significantly.

Against this backdrop, the ALJ found that Plaintiff had two severe impairments – somatoform disorder and depression. Tr. 20.   The ALJ noted that Plaintiff also claimed to suffer from impairments including chronic fatigue and fibromyalgia, and that she had "consistently reported fatigue" to her doctors. Tr. 21.   However, the ALJ found that those impairments were non-severe, for basically two reasons: First, because the diagnoses of chronic fatigue syndrome and fibromyalgia were unsupported by medical findings; and, second, because despite Plaintiff's claims of severe fatigue, doctors reported that she seemed alert and Plaintiff performed "activities of daily living like regularly babysitting her grandchildren and volunteering at the local hospital and Hospice." Tr. 21.   In this regard, the ALJ treated Plaintiff's complaint of fatigue (as well as her alleged chronic fatigue syndrome and fibromyalgia) not as a symptom of somatoform disorder but as completely different non-severe impairment.   However, as noted at the beginning of this discussion, the Commissioner recognizes fatigue as a symptom of somatic disorder.

---

[10]  As noted earlier, when Plaintiff first began treatment at Genesee County, Dr. Racaniello opined that Plaintiff either had a somatoform disorder or she was malingering.   There is no subsequent indication that Dr. Wohltmann felt Plaintiff was malingering.   Rather, she confirmed the diagnosis of somatoform disorder.

Additionally, the ALJ seems to have lumped together the two severe impairments that he found – somatoform disorder and depression— under the category of "mental impairments." Tr. 25.   The ALJ further asserted that Plaintiff's "mental impairments" had "significantly improved" with medication, to the point that Plaintiff was able to stop her medication and be discharged from seeing Wohltmann for medication management. Tr. 25–26.   However, as the ALJ's decision elsewhere indicates, this improvement was in regard to Plaintiff's "mood," referring to her depression. Tr. 25–26.   The ALJ's discussion seems to imply that Plaintiff's somatoform disorder also improved, though the medical records do not support that conclusion.   At least, the Court sees no statement from a treatment provider that Plaintiff ever abandoned her perseverative belief that she had chronic fatigue syndrome and fibromyalgia.   Moreover, Plaintiff continued to complain of chronic fatigue even after her mood improved.   Accordingly, the ALJ erred insofar as he relied on the supposed overall improvement of Plaintiff's "mental impairments" and/or "symptoms" to support his RFC finding. *See*, Tr. 25 ("[S]he experienced significant improvement in her symptoms with medications that she later stopped taking altogether.").

Further, the ALJ essentially indicated that Plaintiff's complaints of "weakness" and "fatigue" were inconsistent with the mental health treatment records, since her mental status examinations had been "normal," and her moods had improved. Tr. 26.   However, Dr. Wohltmann diagnosed Plaintiff with somatoform disorder notwithstanding her generally normal mental status examinations.   Moreover, the improvement in Plaintiff's "mood" pertained to her depression, not her somatoform disorder.   Accordingly, the ALJ's finding in this regard appears unsupported.

Similarly unsupported is the ALJ's decision to reject those aspects of PA Clark's opinion which found that Plaintiff had functional limitations related to fibromyalgia and chronic fatigue syndrome, as being unsupported by abnormal test findings. Tr. 27.    In that regard, the ALJ indicated that the functional limitations identified by Clark were "inconsistent with his own normal examination findings." Tr. 27. (The ALJ gave the same reason for rejecting Toor's opinion that Plaintiff was limited to working 20 hours per week. Tr. 28).   However, as discussed above, the Court views the functional limitations in Clark's opinion as being directly related to Plaintiff's fatigue, as opposed to an actual diagnosis of either chronic fatigue syndrome or fibromyalgia. Moreover, fatigue is a recognized symptom of somatoform disorder, which, as already noted, is a condition that exists specifically where there are no abnormal physical findings. *See*, Listing 12.07 ("These disorders are characterized by physical symptoms or deficits that . . . following clinical investigation, cannot be fully explained by a general medical condition[.]").   Having expressly found that Plaintiff had the severe impairment of somatoform disorder, it seems inconsistent for the ALJ to insist upon abnormal physical findings to support Plaintiff's claim of chronic fatigue.

Further, the ALJ indicated that Plaintiff's activities of daily living were inconsistent with her claim of disability which, again, was based primarily on her alleged fatigue and inability to engage in sustained activity.   The ALJ focused specifically on Plaintiff's ability to babysit for her grandchildren several hours per week, volunteer part-time at a hospital, attend church, exercise, and take trips. Tr. 26.   Again, though, Plaintiff did not claim to be completely unable to engage in activities, including work; rather, she indicated that she could only engage in such activities for a relatively short time (a few hours, at most) before becoming fatigued and needing to rest.

Consequently, the fact that Plaintiff engaged in the activities to which the ALJ referred is not necessarily evidence that she could work on a sustained full-time basis.

Moreover, except for Plaintiff's volunteer work at the hospital, about which there was some questions asked at the hearing, the ALJ did not ask Plaintiff about the specific extent and duration of her activities.   Rather, the ALJ seems to have assumed that because Plaintiff could perform the activities listed above, she could also work full-time.   Similarly, the ALJ rejected Dr. Toor's opinion that Plaintiff was limited to lifting ten pounds occasionally, based on the fact that she babysat her grandchildren, even though the ALJ never asked Plaintiff what, if any, lifting was involved in such babysitting. Tr. ("[T]here is no indication that the claimant is limited to lifting ten pounds, given her babysitting activities[.]")

For all of these reasons, it does not appear that the ALJ gave proper consideration to whether Plaintiff's fatigue, related to her somatoform disorder, prevented her from working on a sustained basis.   Consequently, the Court will remand this matter to the Commissioner for further administrative proceedings.

<u>The ALJ's Alleged Failure to Properly Evaluated Medical Opinion Evidence</u>

Plaintiff contends that in several respects the ALJ failed to evaluate the medical opinion evidence as required by 20 C.F.R. § § 404.1257 & 416.927.   For instance, Plaintiff alleges that the ALJ misinterpreted Toor's report as indicating that Plaintiff could stand, sit and/or use her hands for more than four hours during an 8-hour workday, when the report actually states that Plaintiff could not perform each of those activities for more than four hours.   More significantly, Plaintiff contends that the ALJ failed to explain why he rejected portions of the opinions of Drs. Lin and Figueroa that were favorable to Plaintiff's claim.

With regard to Toor's report, it appears that Toor was indicating that Plaintiff could walk, sit and stand for more than four hours each, as opposed to indicating that Plaintiff was "limited" in doing those activities for more than four hours.   However, to the extent that some ambiguity is caused by the wording of the form,[11] on remand the ALJ should seek clarification from Toor. Additionally, the Court agrees that on remand the ALJ should explain why, in making his RFC finding, he declined to adopt the portions of Lin's and Figueroa's opinions that were favorable to Plaintiff. *See*, SSR 96-8P, 1996 WL 374184 at *7 ("The RFC assessment must always consider and address medical source opinions.   If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").

Finally, the Court finds that on remand the ALJ should, to the extent possible, further develop the record by obtaining a medical source opinion concerning the effects of Plaintiff's somatoform disorder, and the connection between that diagnosis and Plaintiff's alleged fatigue, preferably from Wohltmann or Rocaniello.[12]   In that regard, the Court fails to see why Wohltmann, who treated Plaintiff for over two years, or Rocaniello, would be unable to provide an opinion simply because Plaintiff had recently been discharged as a patient by Genesee County.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No.17) for judgment on the pleadings is granted, Defendant's cross-motion (ECF No. 18) for the same relief is denied and this matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g)

---

[11]  The ambiguity is caused by the placement of the words "limitation" and "limited" on the form.

[12]  The ALJ also evidently believed that it was necessary to develop the record in this regard or else he would not have sent a request for a functional evaluation to Wohltmann.

for further administrative proceedings consistent with this Decision and Order.   The Clerk of the

Court is directed to enter judgment for Plaintiff and close this action.

      So Ordered.

Dated: Rochester, New York
      September 30, 2021

                ENTER:


                /s/ Charles J. Siragusa
                CHARLES J. SIRAGUSA
                United States District Judge